**RESEARCH CORPORATION**

v.

**GOURMET'S DELIGHT MUSHROOM CO., INC., Gourmet's Delight Mushroom and Richard E. Pia**

v.

**SPAWN MATE, INC.**

**Civ. A. No. 81–4427.**

United States District Court,
E.D. Pennsylvania.

April 5, 1983.

As Amended May 6, 1983.

812

David Anderson, Hume, Clement, Bunks, William & Olds, Ltd., Chicago, Ill., for plaintiff.

H. Laddie Montague, Jr., Berger & Montague, P.C., Stanley H. Cohen, Caesar, Rivise, Bernstein & Cohen, Ltd., Philadelphia, Pa., for defendants.

OPINION

LUONGO, Chief Judge.

This is an action for patent infringement brought by plaintiff, Research Corporation (Research), owner of United States Patent No. 3,942,964 for "Delayed Release Nutrients for Mushroom Culture." Research obtained the patent by assignment from the co-inventors, Lee C. Schisler and Alban David Carroll, Jr. Defendants have moved to compel discovery of communications between Schisler and the patent attorney retained by Research to represent Schisler and his co-inventor in the prosecution of the patent application. Research opposes discovery on the ground of attorney-client privilege. I have already determined, and counsel for defendants has conceded, that these communications are shielded by the privilege. The sole issue remaining is whether these communications were made in furtherance of a fraud upon the Patent and Trademark Office (PTO), thus vitiating the privilege.

As a defense to the charge of infringement, defendants have alleged that Research's patent is unenforceable because it was procured through fraud. Essentially, defendants allege that Schisler and the patent attorney, Norman Oblon, knowingly and intentionally failed to apprise the Examiner of relevant prior art and misrepresented the content of other prior art. To help establish this defense, defendants seek discovery of correspondence between Schisler and Oblon pertaining to the preparation and prosecution of the patent application. Defendants contend that this correspondence is discoverable despite the claim of privilege if they establish prima facie that the correspondence was part of a fraud upon the PTO. Relying upon the undisputed documentary evidence of record, defendants assert that they have made such a showing.

Building upon the dictum of Justice Cardozo in *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933),

the courts have recognized that the protection afforded confidential communications between a patent attorney and his client is forfeited upon a prima facie showing that the communications were made in the furtherance of a fraud upon the PTO. *Natta v. Zletz,* 418 F.2d 633, 636, 163 U.S.P.Q. 675, 678 (7th Cir.1969); *Hercules Incorporated v. Exxon Corporation,* 434 F.Supp. 136, 155, 196 U.S.P.Q. 401, 415 (D.Del.1977); *Aspen Industries, Inc. v. Chem Lab Products,* 200 U.S.P.Q. 335, 336 (C.D.Cal.1976); *Burlington Industries v. Exxon Corporation,* 65 F.R.D. 26, 40, 184 U.S.P.Q. 651, 658 (D.Md. 1974). "The mere allegation of fraud, however, is not sufficient to terminate the attorney-client privilege. *Prima facie* evidence of fraud, not mere suspicion of fraud, is required to abrogate the privilege." *Burlington Industries v. Exxon Corporation,* 65 F.R.D. at 40, 184 U.S.P.Q. at 658. The parties agree that this is the controlling precept. They disagree as to the application of this principle to the undisputed facts now before the court. Before undertaking that application, it is necessary to review the history of the patented invention and the alleged misrepresentation and nondisclosures of prior art made in connection with the prosecution of the patent.

The patent in question was issued on March 9, 1976, in the names of Schisler and Carroll, claiming as new a process for increasing mushroom crop yield by supplementing the mushroom compost with denatured proteins at the time of spawning.[1] This process was apparently discovered in late 1972 to early 1973 when Carroll was a graduate student of Schisler's at the Pennsylvania State University.

The application to patent this process was filed on behalf of the applicants by Oblon on May 21, 1974. That application is not part of the record on this motion and, therefore, it is not clear whether the application contained any citation of prior art. It is clear, however, that on February 7, 1974, the Examiner rejected all of the applicants' claims for obviousness in view of prior art,

1. Generally speaking, spawning is the time at which spores or "seeds" for growing the mushrooms are placed into the substrate or mushroom compost.

including a 1967 publication by Schisler entitled, "Stimulation of Yield in the Cultivated Mushroom by Vegetable Oils."[2] The Examiner commented that this publication showed it to be "old to supplement the compost at spawning with a mixture of a protein and oil."[3] The applicants' claims differed only in that they specified supplementation at spawning with denatured proteins.

On June 20, 1975, Oblon filed a responsive amendment in an attempt to rebut the Examiner's finding that the claims were obvious in view of the 1967 Schisler article and the other prior art cited in the notice of rejection. Essentially, Oblon's responsive amendment stated that, to those skilled in the art, it would not be obvious from the 1967 Schisler article to think to use denatured proteins to supplement at spawning since the 1967 Schisler article had shown only limited success in increasing yields through supplementation with undenatured proteins.

In 1967, *Schisler,* one of the co-inventors, did disclose the supplementation of mushroom compost at spawning with various protein sources. Schisler reported at that time that the addition of supplement *at spawning,* i.e., at the same time as required by the present invention:

"... *failed* to increase yield when added to compost spawned at the normal spawning rate. However, both materials caused yield increases of approximately 0.5 lb/ft$^2$ when added to compost spawned at the higher spawning rate" (Page 845, Column 2, lines 5–10 under Results).

Further,

"... the yield increase from the ground soybeans occurred during the first three breaks of mushrooms whereas the increase from the added cottonseed oil occurred primarily in the first break. *It should also be noted that increasing the spawning rate alone re-*

sulted in a yield increase of 0.5 lb/ft$^2$" (supra, lines 12–18).

In other words, the attempt to supplement at spawning *was a failure!* Under normal spawning rate *no increase* in yield was found, when the spawning rate was increased an increased yield of 0.5 lb/ft$^2$ was obtained, but that increase was the same *whether the supplement was added or not!*

Schisler went on to explain that when a vegetable *oil* was used, i.e., the material disclosed in the present application and in the Schisler report as being a synergist (page 847, Column 2, lines 5–10), Schisler disclosed that the effect of the oil was limited:

"The increase occurred primarily in the first break of mushrooms" (Page 846, Column 1, lines 12–13, following the Table 2).

In other words, the supplement did not cause any increase, but the oil (the synergist) did cause certain *real* increases, but only on the first break.

. . . .

Referring now to the "Discussion" section of Schisler, page 848,

"Results of the test wherein supplements were added at spawning confirm previous work which showed that the *increasing spawning rate* increased yield independently of the addition of supplement."

Notice it did not say that supplementing the compost increased the yield—it says that increasing the *spawning rate* increased the yield.

The Schisler discussion continues on, repeating the same theme. That is, that supplementation at spawning will not increase yield. According to the Schisler article, only increasing the spawning rate of adding a vegetable oil will increase the yield, but in the latter instance, increases in yield are only observed in the first break[4] of the mushroom crop.

2. *Applied Microbiology,* Vol. 15, No. 4 at pp. 844–50 (July 1967) (Document 76, Exhibit N3).

3. Document 76, Exhibit N1.

4. A "break" or "flush" is roughly defined as the stage at which the mushroom fruit erupts from the layer of casing material and hence is

. . . .

Whereas Schisler's earlier work with supplementation resulted in failure, the use of denatured protein supplementation of the present invention resulted in success.

(Document 76, Exhibit N2) (emphasis in original). In the next official action of the PTO following the filing of this amendment, all of the claims previously rejected by the Examiner were allowed. The patent issued on March 9, 1976.

At oral argument, counsel for Research conceded that the applicants did not provide the Examiner with the complete text of the 1967 Schisler article. According to defendants, the excerpted portions set forth in the responsive amendment do not accurately represent the substance of the article. Defendants also argue that Oblon further misrepresented the teachings of the article in his explanation of the quoted passages. The misrepresentations, say defendants, become still clearer when viewed in light of two other articles published by Schisler prior to the filing of the patent application. Although one of these articles was cited in the body of the patent, it is not clear on this record whether the Examiner considered either article since the applicants did not supply him with a copy. Because these two articles, as well as the 1967 Schisler article, bear critically on whether prima facie evidence of fraud has been shown, it is necessary to examine these articles more fully.

*The Prior Art*

In 1962, Schisler and a co-author published an article entitled, "Nutrient Supplementation of Mushroom Compost at Spawning."[5] The authors recognized at the outset of the paper that there were limits to enriching the mushroom compost during the composting process because, at least during the early stages of the process, nitrogen in the compost becomes ammonified. Ammonia is toxic to the mushroom fruit. Similarly, the authors noted that prior attempts to supplement the finished compost directly had been unsuccessful because the microorganisms in the compost were able to compete with the mushroom mycelium for the additional nutrients. Any increase in yield, therefore, was marginal. Nonetheless, because spawning techniques had improved since the earlier studies, the authors undertook to reexamine the viability of supplementing the mushroom compost with nutrients at the time of spawning.

Using the new spawning techniques, the authors mixed 14 grams of spawn into each square foot of compost. Supplement was added at the same time.[6] Tests were performed using two concentrations of supplement. In the first series of tests, 129 grams of supplement were added per square foot of compost, and in the second series of tests, the concentration was doubled. The supplements screened by the authors covered a wide range of plant and animal concentrates containing protein and carbohydrate in varying proportions.

The authors' early experiments disclosed that the most noticeable effect on yield was produced from plant concentrates with high protein content such as soybean and cottonseed meal. That the protein portion was most important in terms of yield was confirmed in their experiments using protein hydrolyzates as supplement. Regardless of the supplement used, however, the authors observed that a doubling of the supplement concentration had a limited effect on yield.

In quantitative terms, the studies disclosed in the 1962 article showed roughly a fifteen to twenty percent increase in yield over the control when the mushroom com-

available for harvesting. From a single spawning of the mushroom compost, *see* note 1 *supra,* there may be 5 to 8 series of flushes, and in some instances as many as 12.

5. Schisler & Sinden, "Nutrient Supplementation of Mushroom Compost at Spawning," *Mushroom Science,* Vol. V, pp. 150–64 (1962) (Document 76, Exhibit N5).

6. The authors also experimented with higher spawning rates and concluded that the effect was to increase yield independently of the addition of supplement. Increasing both the spawning and supplementation rates gave rise to an even further increase in yield.

post was supplemented at spawning with either cottonseed meal or hydrolyzed vegetable proteins. The increases in yield, however, occurred primarily during the first and second breaks. Although the authors termed the yield increases "significant," they concluded:

> [The] addition of supplements at spawning could have a definite though not very large effect in increasing the yield of mushrooms on a commercial scale. The maximum increase would be not much more than one half pound per square foot or 150g per kg of dry compost. The attainment of such increases is by no means certain, and we should expect an average increase of nearer one quarter pound per square foot or 75g per kg dry weight, this being about 10% of the expected yield.

Document 76, Exhibit N5, at p. 161.

The second Schisler publication in this area is the 1967 article cited by the Examiner and which the defendants allege was misrepresented by Oblon in the responsive amendment. Although the article deals primarily with supplementation at casing,[7] a portion of the article does report on Schisler's work in supplementation at spawning with ground soybean and cottonseed oil. In his first series of tests, Schisler added supplement to compost impregnated with spawn at the "normal spawning rate" of 27.5 grams of spawn per square foot of compost. Without supplementing the compost at spawning, Schisler reported a yield of roughly two pounds of mushrooms per square foot of compost. A marginal increase in yield was obtained when 100 grams of ground soybean were added to each square foot of compost. The same negligible effect on yield was observed when an equivalent concentration of cottonseed oil was used as supplement.

In the second series of tests reported on in the 1967 article, Schisler increased the spawning rate by a product of four. The effect, even without the addition of supplement, was a twenty-five percent increase in yield over that obtained at the normal spawning rate. Then adding supplement at the same concentration levels as before, Schisler obtained an additional twenty-five percent increase in yield. Schisler observed, however, that the increase occurred primarily in the first break when cottonseed oil was used, and during the first three breaks when ground soybean was added.

The final Schisler article was published in 1971, and is entitled, "Supplementation of the Finished Compost at Time of Spawning, at Time of Casing, and Later."[8] Although defendants make much of this article, I have examined it closely and find that it is nothing more than a condensed version of the 1962 article co-authored by Schisler.

One final factual aspect of this case merits discussion before analyzing the contentions of the parties. After this action was commenced and the defense of fraud was raised, Research asked the PTO to reexamine the validity of its patent in light of the defendants' argument that the patent was fraudulently procured. See 35 U.S.C. § 303. On February 23, 1983, the PTO granted Research's request for reexamination. While it declined to consider the fraudulent procurement issue,[9] the PTO did state that the 1971 Schisler article, particularly its discussion of the effects of supplementation at spawning with hydrolyzed protein, "raise[d] a substantial new question of patentability in that the hydrolyzed protein would appear to satisfy patentee's definition of a denatured protein as stated in the ... patent." Document 128, Exhibit A, at 2–3. The reexamination proceedings are still pending before the PTO.

7. Casing occurs approximately 21 days after spawning and involves the placement of a layer of top soil or peat moss over the surface of the mushroom compost.

8. *Mushroom News*, Vol. 19, No. 4, at pp. 3–13 (April 1971) (Document 76, Exhibit N6).

9. The PTO explained that the fraud issues were beyond the scope of the reexamination proceedings. See 37 C.F.R. 1.552 (1982).

*The Contentions of the Parties*

A two-fold argument is presented by defendants to support their assertion that they have met their burden of proving prima facie fraud. First, they contend that deliberate misstatements of the content of the 1967 article were made in the responsive amendment filed by Oblon with the PTO. Apparently to suggest active concealment on the part of Oblon and Schisler, defendants emphasize that it was the Examiner who uncovered the 1967 article. Furthermore, defendants maintain that the responsive amendment was misleading, inaccurate and incomplete insofar as the 1967 article was represented as demonstrating that Schisler had failed in his attempt to increase yield through supplementation at spawning. Defendants admit that, at normal spawning rates, the 1967 article did show only marginal increases in yield when supplement was added at the time of spawning, but they point out that the Examiner was not told that the 1967 article also reported dramatic increases in yield when supplement was added in combination with a four-fold increase in the rate of spawning. Defendants contend that there is no way of knowing whether the Examiner was aware of this because it is admitted that the applicants did not furnish the PTO with a copy of the complete text of the article.

The second prong of defendants' argument is that Schisler and Oblon knowingly and intentionally withheld the 1971 Schisler article from the Examiner. According to defendants, this article shows that, even at normal spawning rates, Schisler had succeeded in increasing crop yield by supplementing the mushroom compost at the time of spawning. In defendants' view, this article directly refutes the statement in the responsive amendment that prior attempts to supplement at spawning were failures. Furthermore, defendants point out that the materiality of this article is beyond dispute. Because the PTO in determining to reexamine the patent has found that the 1971 article raises a "substantial new question of patentability," defendants contend that there can be no question that the Examiner would have considered this article important in determining whether the patent owned by Research should have issued. Defendants conclude by emphasizing that they have no obligation to establish actual fraud upon the PTO; they need only make out a prima facie case of fraud to vitiate the privilege. They maintain that they have satisfied that burden.

Research responds that it is critical to bear in mind that supplementation at spawning with *denatured* proteins is the distinguishing feature of its patent. Research points out that the three Schisler articles relied upon by defendants all involved the use of *undenatured* proteins to supplement the mushroom compost.[10] Beyond this, Research argues that defendants have failed to establish prima facie fraud because they have not shown that, but for the alleged misrepresentations and nondisclosures, the patent would not have issued. In other words, Research argues that there has been no showing whatsoever that the Examiner relied on the alleged misstatements and nondisclosures in determining to allow the applicants' claims. According to Research, the responsive amendment did not misstate the teachings of the 1967 article. That article did in fact show only marginal increases in yield when supplement was added to compost impregnated with spawn at the normal rate. If it was misleading to fail to disclose that success

10. Defendants do not accept Research's assertion that the 1971 article dealt only with supplementation with undenatured proteins. Defendants have submitted an affidavit to show that many of the nutrients discussed in that article were in fact denatured. Accordingly, defendants argue that the applicants' fraud was compounded by the nondisclosure of the 1971 article. For reasons elaborated upon, *infra*, I am not persuaded by defendants' argument.

While the 1971 article was not disclosed to the Examiner, the 1962 article was cited to in the body of the patent. Because the nutrients discussed in the 1962 article are identical to those referred to in the 1971 article, the failure to disclose the existence of the 1971 article is in my view insignificant. Furthermore, defendants have offered nothing to suggest that the Examiner did not review the 1962 article.

had been obtained at higher spawning rates, Research argues that no harm has been shown. Research contends that there is no reason to believe that the Examiner was not in possession of the 1967 article and presumably he was capable of drawing his own conclusions therefrom. Similarly, if it was improper for the applicants to fail to bring the 1971 article to the Examiner's attention, Research again argues that there is no reason to believe that the patent would not otherwise have issued. The 1971 article, in Research's view, does no more than reiterate what was said in the 1962 article co-authored by Schisler. While these articles were not supplied the Examiner by the applicants, the 1962 article was cited and discussed in the body of the patent itself. Research concludes, therefore, that there is nothing in this record to suggest that the Examiner was misled.

In support of its argument that proof of reliance in the "but for" sense is essential to establish a prima facie case of fraud upon the PTO, Research cites *American Optical Corporation v. United States,* 179 U.S.P.Q. 682 (Ct.Cl.1973), wherein the Court of Claims held:

> In order to pierce the [attorney-client] privilege, it is not enough to show merely inequitable conduct before the Patent Office. Rather, it is necessary to establish a case of fraudulent procurement; i.e., one must show (1) a knowing, willful and intentional act of misrepresentation or omission before the Patent Office; (2) the misrepresentation or omission must be material; and (3) the Patent Office must have relied upon the misrepresentation or omission....
>
> In order to show that a misrepresentation or omission is material, the courts have usually resorted to a "but for" test, i.e., that but for the omission or misrepresentation the claims would not have been allowed.... However, it is more logical to say that satisfaction of this "but for" test, while still necessary to prove fraud, tends to show "reliance" as opposed to materiality. To be material, the reference need only relate to the subject matter of the claims; but to show reliance

one must show that the examiner would have rejected the claims had he known all of the facts. Of course, the reliance must be a reasonable one. As stated in *Mueller Brass Co. [v. Reading Industries,* 176 U.S.P.Q. 361 (E.D.Pa.1973)] at 371:

> Where the Patent Office should have caught the untruth, fraud will not be found, though a court as a court of equity may refuse to enforce a patent so obtained.

179 U.S.P.Q. at 684 (citations omitted). Research further argues that the holding in *American Optical* is binding upon this court because any appeal in this patent infringement action must be taken to the Court of Appeals for the Federal Circuit, *see* 28 U.S.C. § 1295(a)(1), which has adopted the prior decisions of the Court of Claims and the Court of Customs and Patent Appeals as binding precedent, *see South Corporation v. United States,* 690 F.2d 1368, 1370 (Fed. Cir.1982).

Defendants argue strongly that *American Optical* was wrongly decided. They conclude, based upon the several decisions discussed in their memorandum of law, that "[t]he *American Optical* [but for] test has not been adopted by the majority of jurisdictions faced with the issue of patent fraud." Defendants' Supplemental Memorandum in Support of Their Motion to Compel (Document 128), at 10. Of particular note to defendants is the decision of Judge McLean in *SCM Corporation v. RCA,* 318 F.Supp. 433 (S.D.N.Y.1970), where the court expressly rejected the "but for" formulation and denied enforcement of a patent because of fraud. Defendants rely heavily on the following passage from the opinion in that case:

> *No one can tell with certainty what would have happened if RCA had dealt fairly with the Patent Office. But the fact remains that RCA did withhold relevant facts.* Which side in this litigation is to suffer from this conduct? It is appropriate that it should be RCA who suffers. Any other rule would fail adequately to discourage conduct of this sort merely because of the circumstance,

which must be present in many cases, that it turns out to be impracticable to ascertain what the Examiner, who did not know the true facts, would have done if he had known them. The evidence here justifies the conclusion that this court should not enforce a patent obtained under these circumstances. I so hold.

318 F.Supp. at 449–50 (emphasis added by defendants). In the view of defendants, the same reasoning applies here. They argue that it is impossible to determine whether the Examiner would have allowed the claims had the applicants not misrepresented the content of the 1967 article in the responsive amendment. It is equally impossible, they maintain, to determine whether the patent would have issued had the applicants disclosed the existence of the 1971 article to the Examiner. Nevertheless, defendants argue that material misrepresentations and nondisclosures were committed. They conclude that the brunt of this inequity should be borne by Research, the owner of the patent. More to the point, they contend that reliance is not an element of their prima facie case. In their view, they have sustained their burden and the attorney-client privilege protecting the communications between Schisler and Oblon has been forfeited.

*Discussion*

■ Defendants' argument misses the mark. The issue now before the Court is not whether Research's patent should be denied enforcement because of the inequitable conduct practiced on the PTO. I grant that "the *quid pro quo* for the acquisition of a patent monopoly is an insistence that the circumstances surrounding the application for the patent be 'free from fraud and other inequitable conduct.'" *Monsanto Company v. Rohm & Haas Company,* 456 F.2d 592, 597–98 (3d Cir.) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945)), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972). I am also aware that in determining whether to deny enforcement of a patent, equitable principles control, and he who

comes into equity must come with clean hands. Accordingly, courts have frequently recognized that reprehensible conduct, although not amounting to fraud in the technical sense, is sufficient to deny enforcement of a patent. *Norton v. Curtiss,* 433 F.2d 779, 792–93 (Cust. & Pat.App.1971). On the issue of patent enforceability, the test is whether the applicant has "displayed that standard of conduct requisite to the maintenance of a suit in equity." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 819, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945).

■ The issue now before me is not whether Research's patent is enforceable, but rather whether the privilege shielding the Oblon-Schisler communications has been vitiated under the fraud exception to the attorney-client privilege. With respect to this issue, equitable principles are inapplicable. The attorney-client privilege is not unique to patent law. Likewise, the fraud exception to the privilege is not measured by standards uniquely adapted to patent proceedings. To adopt defendants' argument and conclude that a strong showing of inequitable conduct is enough to cause a forfeiture of the privilege implies that communications between patent counsel and client merit lesser respect than, for example, those between client and proctor in admiralty. In my view, the law recognizes no such distinction.

■ By its nature, a patent is affected with a strong public interest. *Precision Instrument Mfg. Co., supra,* 324 U.S. at 816, 65 S.Ct. at 998. It is both a privilege recognized under our Constitution and "an exception to the general rule against monopolies." *Id.* Hence because of the patent's far-reaching social and economic implications, the public has "a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct." *Id.* As a consequence, the caselaw and the Rules of Practice in Patent Cases require patent attorneys and applicants to exercise the highest degree of candor and good faith in their dealings with the PTO. *Kingsland v. Dor-*

*sey,* 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949); 37 C.F.R. 1.56 (1982).

■ The protection of the public interest is unquestionably at the core of the patent attorney's duty of candor toward the PTO. The attorney-client privilege is not, however, inherently detrimental to federal patent policy and the protection of the public interest. *In re Natta,* 410 F.2d 187, 190–91, 161 U.S.P.Q. 389, 391 (3d Cir.1969); *Natta v. Hogan,* 392 F.2d 686, 691–92, 157 U.S.P.Q. 183, 187 (10th Cir.1968); *Collins & Aikman Corp. v. J.P. Stevens & Co.,* 51 F.R.D. 219, 220–21, 169 U.S.P.Q. 296, 297 (D.S.C.1971). The duty of candor largely equates with a duty of disclosure. The purpose of the attorney-client privilege, on the other hand, is to facilitate the administration of justice by encouraging the free and open exchange of information between attorney and client. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 503[02] (1982); 8 J. Wigmore, *Evidence* § 2291 (McNaughton rev. 1961). The duty of candor and the privilege thus serve differing interests, *Natta v. Hogan, supra,* 392 F.2d at 691; 157 U.S.P.Q. at 187; more often than not, however, the freedom of consultation fostered by the privilege aids the patent attorney in satisfying his duty of full disclosure to the PTO. Recent decisions, therefore, have uniformly recognized the applicability of the attorney-client privilege to patent proceedings. *See Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26, 34–35, 184 U.S.P.Q. 651, 653–54 (D.Md.1974).

■ The premise supporting the attorney-client privilege is that freedom of consultation promotes the administration of justice by enabling the attorney to properly, competently and ethically represent the client. The fraud exception to the privilege emanates from the realization that the purpose of the privilege is obviously frustrated if the attorney-client relationship is used as a vehicle to further unlawful action. M. Larkin, *Federal Testimonial Privilege* § 2.07[1] (1982). In the words of Justice Cardozo, "[t]he privilege takes flight if the relation is abused." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed.

993 (1933). In recent years, the courts have confronted with increasing frequency the claim that privileged communications between patent counsel and client are discoverable under the fraud exception to the attorney-client privilege. Perhaps, as a result, it is easy to overlook that this exception applies in other contexts as well. *See, e.g., Union Camp Corporation v. Lewis,* 385 F.2d 143 (4th Cir.1967) (per curiam); *Ohio-Sealy Mattress Mfg. Co. v. Kaplan,* 90 F.R.D. 21 (N.D.Ill.1980); *United States v. Mackey,* 405 F.Supp. 854 (E.D.N.Y.1975); *International Telephone & Telegraph Corp. v. United Telephone Co.,* 60 F.R.D. 177 (M.D.Fla.1973). But there is a great danger in losing sight of the foundations of this narrow exception to the attorney-client privilege. That danger is particularly keen in this case. The exception is more commonly referred to as the "crime or fraud" exception. 2 J. Weinstein & M. Berger, *Weinstein's Evidence, supra,* ¶ 503(d)(1)[01]. As its name connotes, it encompasses only serious unlawful activity. Hence, for the privilege to take flight, unlawful conduct, not mere inequity, must be demonstrated. *See American Optical Corp., supra,* 179 U.S. P.Q. at 684.

■ This reasoning, although not stated in so many words, underlies the holding in *American Optical.* The court in *American Optical* recognized that inequitable conduct may be sufficient to render a patent unenforceable; but it expressly disavowed that standard as a test for piercing the attorney-client privilege. I am inclined to follow the holding in that case. Accordingly, to prevail on their motion to compel, defendants must establish a prima facie case of fraud. In order to meet that burden, they must, *inter alia,* show that had the Examiner known of the misrepresentations and omissions, he would have rejected the applicants' claims. *Id.* at 684–85.

Mindful that fraud must be proven by clear and convincing evidence, *DeLong Corporation v. Raymond International, Inc.,* 622 F.2d 1135, 1145 (3d Cir.1980), I conclude that defendants have fallen far short of satisfying their burden. As pointed out in

their memorandum of law, it was the Examiner who uncovered the 1967 article. Presumably, he was fully capable of evaluating that article in terms of its significance to the patentability of the invention sought to be patented. If the responsive amendment contained misrepresentations or half-truths concerning the content of that article, it is reasonable to assume, in the absence of contrary evidence, that the Examiner detected them and found them to be immaterial to the patentability of the applicants' claims. It is equally reasonable to assume that the Examiner found the statements in the responsive amendment not so egregious as to warrant rejection of the claims. To accept defendants' argument requires that I infer from the applicants' failure to furnish the PTO with a complete copy of the article that the Examiner did not consider the 1967 article in its entirety. Since it is the defendants' burden and because it was the Examiner who discovered the 1967 article, I decline to draw this inference. There is no evidence that the Examiner relied in any way on the alleged misstatements and omissions contained in the responsive amendment.

Notwithstanding the pending reexamination proceedings and the PTO's finding that the 1971 article is significant thereto, I have even less difficulty with the applicants' failure to disclose the existence of the 1971 Schisler article. That article is merely an abbreviated version of the 1962 article coauthored by Schisler and cited in the body of the published patent. In my view, the 1962 article is the best example of prior art relating to the subject matter of the invention sought to be patented. Unlike the 1971 article, it sets forth in considerable detail the method employed by the authors in their study of supplementation at spawning. The earlier article also discusses the effect of supplementation with nutrients *in addition* to those discussed in the 1971 article. Finally, the conclusions reached in the two articles are substantially identical.

Admittedly, a copy of the 1962 article was not furnished the PTO by the applicants. Their failure to do so is not persuasive. It was disclosed to the Examiner that the 1962 article was highly relevant to the subject matter of the applicants' claims. Indeed, within the first few paragraphs of the printed patent, it is stated:

It was reported by Schisler et al, Mushroom Science V, pages 150–164 (1962) . . . that attempts at directly feeding the mycelium . . . were successful and produced marked stimulation of mushroom crop yield, when certain uncomposted nutrients were added to the compost at the time the mushroom mycelium is spawned into the compost . . . .

However, while a significant 10% crop increase was found when small amounts of the supplements were added at spawning, higher rates of supplement did not further increase yield.

(Schisler Deposition, Document 111, Exhibit 1, Column 1). The statement that a 10% increase in yield was obtained when "certain uncomposted nutrients" were added should certainly have alerted the Examiner. It must be remembered that he too had a duty to make "a thorough investigation of the available prior art relating to the invention sought to be patented." 37 C.F.R. 1.104(a) (1982). At a minimum, he should have researched the article to identify the nutrients discussed therein and to determine whether they rendered the applicants' claims old or obvious. There is no indication in the record that the Examiner did not undertake that investigation. Even if he did not make the required investigation, his failure to do so does not render the applicants' conduct fraudulent. The propriety or impropriety of their failure to do no more than cite the article is an issue relevant only to whether Research's patent is enforceable. It is not sufficient to pierce the attorney-client privilege.

In conclusion, defendants have not established prima facie that the Schisler-Oblon communications were made in the furtherance of fraud upon the PTO. Accordingly, I will deny defendants' "Motion to Compel Production of Documents and Responses to Deposition Questions Directed to Dr. Lee C. Schisler, etc." (Document 88). I add, however, that at this time I express no opinion

as to whether the alleged misrepresentations and nondisclosures made during the prosecution of Research's patent constitute conduct so reprehensible as to render that patent unenforceable.